

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-20-2007

# USA v. Tomko

Precedential or Non-Precedential: Precedential

Docket No. 05-4997

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Tomko" (2007). *2007 Decisions*. Paper 499.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/499

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-4997

———

UNITED STATES OF AMERICA,

Appellant

v.

WILLIAM TOMKO

———

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 04-cr-00108)
District Judge:  Honorable Gary L. Lancaster

———

Argued October 24, 2006
Before:  SMITH, FISHER and COWEN, *Circuit Judges*.

(Filed: August 20, 2007 )

Alan Hechtkopf
S. Robert Lyons (Argued)
United States Department of Justice
Tax Division
P.O. Box 502
Washington, DC  20044
        *Attorneys for Appellant*

J. Alan Johnson
Cynthia R. Eddy (Argued)
Johnson & Eddy
707 Grant Street
1720 Gulf Tower
Pittsburgh, PA  15219
        *Attorneys for Appellee*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

The Government appeals from a judgment of sentence imposed on William Tomko, Jr., who pleaded guilty to a fraudulent scheme to evade personal income taxes.  Tomko's fraudulent scheme resulted in a tax deficiency of more than $225,000.  The District Court imposed a below-Guidelines sentence consisting of 250 hours of community service, three years of probation (including one year of house arrest), and a fine of $250,000.  Tomko was also ordered to undergo twenty-

eight days of in-house treatment for alcohol abuse. As discussed below, this sentence is unreasonable in light of the circumstances of this case and the sentencing factors outlined in 18 U.S.C. § 3553(a). It was therefore an abuse of discretion for the District Court to impose it and we will vacate the judgment and remand for resentencing.

## I. BACKGROUND

William G. Tomko, Jr., pleaded guilty to a fraudulent scheme to evade federal income taxes that revolved around the construction of his luxurious new home in southwestern Pennsylvania. From 1996 through 1998, during the construction of this home, Tomko had numerous subcontractors falsify their billing invoices to make it appear their work had been done for his construction company, W.G. Tomko, Inc. ("Tomko, Inc."), at one of its job sites, rather than for Tomko, the individual, at his personal residence. As a result, the company paid the construction costs of the home, illegally deducted the expenses, and Tomko did not properly report the value of the construction costs paid for by the company as income on his personal income taxes.[1] The scheme resulted in a stipulated tax deficiency of $228,557.

---

[1]Tomko, Inc. is classified as a flow-through "Subchapter S Corporation" under the federal tax code. An S Corporation's shareholders are required to include on their personal income tax returns their share of the S Corporation's separately stated items of income, deduction, loss, and credit, and their share of non-separately stated income or loss.

Numerous subcontractors were involved in Tomko's scheme. One subcontractor, for example, who installed the lawn sprinkler system at Tomko's residence, told Internal Revenue Service-Criminal Investigation Division (IRS-CID) investigators that he wrote billing invoices at Tomko's behest that made it appear his work had been done at one of five local area schools. Because Tomko, Inc. was working jobs at these local schools, the company could appear to be legitimately paying the invoices.[2] As a result, the construction costs were diverted from Tomko personally to Tomko's company, which then deducted them as expenses. Similarly, another subcontractor, who installed the granite and marble countertops throughout Tomko's home, told the IRS-CID investigators that Tomko had stated "I'll pay you but this is how I want it written up." Tomko then instructed him to prepare invoices indicating that the work had been done at one of the local area schools so that Tomko, Inc. could foot the bill and deduct the expenses.

There are even more egregious examples in the record of this sort of fraudulent misrepresentation. One subcontractor, who built custom cabinetry for Tomko's house, stated that he was told by Tomko to "be creative" in his billing and that he had previously been "tipped" that Tomko was running the costs of the construction through his business. Another subcontractor,

---

[2]Upon the receipt of these invoices, Tomko, Inc. paid the subcontractors in the normal course of business and posted the expenses to the jobs that were listed on the invoices. Tomko as an individual then attempted to evade personal income taxes by omitting the company payment of his personal expenses on his Form 1040 personal income tax return.

who installed stainless steel kitchen fixtures at the house, stated that Tomko told him he "wanted this job run through [a local school]" and that the billing invoice was to be sent to Tomko, Inc. Another subcontractor, who did specialty wiring at the house, stated that Tomko instructed him to prepare false invoices indicating that the services he had provided for the house were actually done for yet another local school.

IRS-CID investigators interviewed seventeen individuals in all with respect to Tomko's scheme. While the details vary from individual to individual, in most cases the pattern of conduct resembled the examples already described – Tomko attempted to evade paying taxes by fraudulently diverting construction costs through his company, Tomko, Inc., deducting the costs as business expenses, and then failing to report as income the value of the services provided to him personally. On October 4, 2001, an IRS-CID agent contacted Tomko to advise him there was an allegation of unreported income against him and to request an interview. On May 11, 2004, Tomko waived indictment and pleaded guilty to a one-count information charging tax evasion for 1997, in violation of 26 U.S.C. § 7201.

Tomko was sentenced on September 30, 2005.[3] At the sentencing hearing, the District Court properly recognized its obligation to calculate the correct advisory United States Sentencing Guidelines ("Guidelines") offense level and concluded that the applicable offense level was thirteen.[4] The

[3]The Government had previously requested a four-level enhancement of the offense level under U.S.S.G. Manual § 3B1.1(a) for Tomko's alleged leadership role in the offense. It argued "what [Tomko] did was he got five or more people to essentially assist him in his tax violation, and once he does that . . . they're participants if they had the criminal intent . . . we submit these people do have criminal culpability." In response, counsel for Tomko argued the subcontractors did not necessarily "know what was going on." The Government stated, however, that it had been provided with statements from the subcontractors admitting they knew Tomko's ultimate goal was to evade the payment of taxes. The District Court observed that "in order to be a participant, you have to be criminally responsible . . . and simply knowing a crime is taking place does not make you an aider or abettor." The District Court then made a tentative ruling that the four-level enhancement was not applicable based upon the Government's proffer that Tomko had coerced some of the subcontractors into participating. As a result, the District Court reasoned, they were not "willing participants." The Government has waived any appeal of this ruling, mentioning it only by way of footnote in its brief and expressly waiving any objection at oral argument.

[4]August 17, 2007The resulting Guidelines level was calculated as follows:

recommended Guidelines sentencing range for this offense level is twelve to eighteen months of incarceration, but defense counsel proposed, in lieu of imprisonment, that Tomko be allowed to do volunteer work with Habitat for Humanity and assist in its efforts to provide housing for victims of Hurricane Katrina. Counsel stated "I wouldn't ask that normally, Your Honor, but it seems to me that if he were sitting in prison, whether it's minimum security or medium security or whatever, and he could be helping the people who have been so devastated so significantly in the New Orleans area and in the Gulf Coast area . . . ."

Defense counsel then presented as a witness the Executive Director of the Pittsburgh affiliate of Habitat for Humanity, who was first contacted about Tomko's interest in volunteering, after Tomko's guilty plea. The Director was generous in her appraisal of Tomko. She testified that his construction expertise and local contacts had helped the organization immensely and that he had been able to contribute substantially to a number of their ongoing construction projects.

---

Base Offense Level for violation of 26 U.S.C. § 7201: (16)
(§§ 2T1.1 and 2T4.1 (tax loss determined to be $228,557.00))
Adjustment for Role in the Offense: (0)
Adjustment for Obstruction of Justice: (0)
Acceptance of Responsibility: (-3)
(§ 3E1.1(a) and (b))
Applicable Sentencing Guideline offense level: (13)

She outlined the Pittsburgh Habitat for Humanity's plans to aid in the Gulf Coast reconstruction efforts by building prefabricated housing ("Home in a Box Program") for shipment to the Gulf Coast and Tomko's assistance in that effort.

Defense counsel also proffered testimony from Tomko, Inc.'s chief financial officer stating that Tomko's absence from the company could very well place Tomko, Inc. in dire straits financially. The Court indicated that it had reviewed and considered all motions and briefs submitted by the parties. One of these motions was a Motion for Downward Departure, in which defense counsel stated as grounds for downward departure: (1) the effect incarceration would have on Tomko's business, causing a job loss to more than 300 innocent employees; (2) Tomko's exceptional charitable and community activities; (3) extraordinary acceptance of responsibility; and (4) a combination of factors. The motion included as exhibits over fifty letters from friends, family, and community leaders attesting to Tomko's generosity and compassion.

After stating that it had reviewed and considered all motions and briefs submitted by the parties, the District Court then proceeded to place on the record its consideration of the Guidelines and the § 3553 factors.[5] First, in considering the

_____

[5]Under § 3553(a), the relevant factors are:
(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;
(2)    the need for the sentence imposed--
    (A) to reflect the seriousness of the

offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established . . .

(5) any pertinent policy statement--

(A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(B) that, except as provided in section 3742(g) [18 USCS § 3742(g)], is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of

nature and circumstances of the offense, § 3553(a)(1), the District Court found that the offense was nonviolent, not ongoing in nature, not part of a larger pattern of criminal activity, and that there were no identifiable victims of the offense. Regarding the history and characteristics of the defendant, *id.*, the Court noted Tomko's good family history, educational attainment, gainful employment, and negligible criminal history. It also observed that Tomko had a drinking problem that could benefit from treatment and moderate depression that was already being treated. Second, in applying § 3553(a)(2), the Court considered that tax evasion was a serious offense, but that Tomko had led an otherwise crime-free life and there was little likelihood of recidivism. Finally, in addressing § 3553(a)(3), (4), and (6), the Court considered the kinds of sentences available and "the need for unwarranted sentence disparities among Defendants with similar records who have been found guilty of similar conduct" and acknowledged that "these considerations generally weigh in favor of sentencing a Defendant within the Guidelines range." The Court then concluded:

> However, this need to avoid unwarranted sentence disparities among Defendants with similar records also gives me enough leniency [] to understand that there are differences and those differences have to be taken into account. I recognize the need for consistent sentencing; however, in this

similar conduct; and

(7)     the need to provide restitution to any victims of the offense.

10

case, given the Defendant's lack of any significant criminal history, his involvement in exceptional charitable work and community activity, and his acceptance of responsibility, we find that a sentence that is mitigated by the factors of 3553 are warranted.

In urging the District Court to sentence Tomko to incarceration rather than home confinement, the Government observed that Tomko had "cheated his Government out of the money to build his house" and that "it would be a travesty of justice to put [Tomko] in the very mansion he stole from the Government, from these very citizens." It also asserted that probation would be sending the message "you can buy your way out of trouble." Speaking of the contracting industry specifically, which it suggested was "riddled with tax fraud," the Government argued that a sentence of probation would be interpreted as "go ahead, cheat on your taxes. If you get caught, you'll have to pay some money, but you won't have to go to prison." The Government argued that "real deterrence is jail" and "the threat of jail is real for these white collar criminals that commit tax fraud" and "[w]hat we need to do is make good on this threat." Summing up its impassioned plea, the Government concluded:

Bottom line, Your Honor, is that a sentence of probation is just a rich guy buying his way out of jail, a validation of the efficacy of cheating on your taxes, a slap in the face to honest citizenry, grossly unfair to our indigent Defendants, and a

11

travesty of justice. Do the necessary and right thing in this case and send this tax cheat to jail.

The District Court then sentenced Tomko to 250 hours of community service, three years of probation with one year of home confinement, and ordered him to pay a fine of $250,000. Tomko was also ordered to undergo twenty-eight days of in-house alcohol treatment. As reason for this judgment, the District Court stated:

Defendant stands before us for sentencing after pleading guilty to tax evasion. A review of the Defendant's financial condition paints a picture of a very wealthy man who had the means and the wherewithal to easily pay whatever tax obligation is owing. He was a successful businessman earning a significant salary. There is simply no reason for him to have done this.

This being said, I also note his negligible criminal history, his record of employment, his support for and ties in the community, and extensive charitable work he has done. I have also – therefore, I have sentenced him to a period of probation, which I recognize is below the guideline range. Given the Defendant's wealth, the guideline range in fines is insufficient deterrence.

Therefore, I've done this mitigation of the sentence under the provisions set forth in 18

12

U.S.C. § 3553 for the reasons I stated. Taking all these factors into account, the Court sentences the Defendant to a period of probation, a substantial fine, and allows for repayment to the Internal Revenue Service of his outstanding tax obligation. The Court views that this sentence will address the sentencing goals of punishment, deterrence and rehabilitation.

As this excerpt demonstrates, the Court recognized that the sentence was below the Guidelines, but explained that it had mitigated the sentence in consideration of factors set forth in 18 U.S.C. § 3553. The Government filed a timely notice of appeal.

## II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to review the judgment of sentence of the District Court under 18 U.S.C. § 3742(b)(1). *See United States v. Cooper*, 437 F.3d 324, 327 (3d Cir. 2006). We review the sentence imposed for "reasonableness," the standard announced by the Supreme Court in *United States v. Booker*, 543 U.S. 220 (2005), after the Court held that mandatory application of the Guidelines was unconstitutional. *Id.* at 261-62.[6] In *Rita v. United States*, No. 06-5754, 2007 WL

---

[6]Our post-*Booker* precedent instructs district courts to follow a three-step sentencing process: (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*; (2) in doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that

1772146 (June 21, 2007) (affirming the application of a presumption of reasonableness by a court of appeals to a district court's within-Guidelines sentence), the Court clarified that the reasonableness standard of appellate review is akin to abuse of discretion and accordingly deferential, giving trial judges broad discretion to craft sentences that they believe promote the sentencing goals stated in 18 U.S.C. § 3553(a). *See id.* at *9 ("[A]ppellate 'reasonableness' review merely asks whether the trial court abused its discretion."). However, before we can conclude that a sentencing court properly exercised its discretion, we must assure ourselves that it actually gave "meaningful consideration" to the § 3553(a) factors and "reasonably applied them to the circumstances of the case."

departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force; and (3) finally, they are required to "exercise[] [their] discretion by considering the relevant [§ 3553(a)] factors," *Cooper*, 437 F.3d at 329, in setting the sentence they impose regardless of whether it varies from the sentence calculated under the Guidelines. *See generally United States v. King*, 454 F.3d 187 (3d Cir. 2006). We continue to review the district courts' factual findings at steps one and two for clear error. *See United States v. Grier*, 475 F.3d 556, 570 (3d Cir., Feb. 5, 2007) (en banc) ("Despite the excision of subsection (e) of 18 U.S.C. § 3742, this Court will continue to review factual findings relevant to the Guidelines for clear error and to exercise plenary review over a district court's interpretation of the Guidelines.") (citations omitted). However, the ultimate inquiry for purposes of *Booker* is whether the resulting sentence is "reasonable." *See id.* at 568.

14

*Cooper*, 437 F.3d at 330. Ultimately, "what we must decide is whether the district judge imposed the sentence he or she did for reasons that are logical and consistent with the factors set forth in section 3553(a)." *Id.* (citation omitted).

The Court in *Rita* was careful to emphasize the importance of effective substantive oversight by the Courts of Appeals over sentencing in the District Courts. *See Rita*, 2007 WL 1772146, at *10. ("In sentencing, as in other areas, district judges at time make mistakes that are substantive. At times, they will impose sentences that are unreasonable. Circuit courts exist to correct such mistakes when they occur."). Consequently, reasonableness review, while deferential, is not utterly impotent. As the Second Circuit has stated, "review for reasonableness, though deferential, [does] not equate to a rubber stamp." *United States v. Rattoballi*, 452 F.3d 127, 132 (2d Cir. 2006) (internal quotation marks omitted). Similarly, the Eleventh Circuit has observed that there is "a difference between deference and abdication." *United States v. Crisp*, 454 F.3d 1285, 1290 (11th Cir. 2006).[7] Indeed,

---

[7]Distinguishing between deference and abdication in reasonableness review may not always be an easy task, as evidenced by the dissent's disagreement with our application of the standard of review in this case. The dissent argues we impermissibly re-weigh the District Court's consideration of some of the § 3553(a) factors, and in doing so, engage in *de novo* review. *See* Dissenting Op. at 49-50 ("The District Court simply weighed the § 3553(a)(1) factors differently from how the members of this panel would have weighed them. . . . [I]t is not the role of this Court to review a factor de novo when

analyzing whether a variance is unreasonable."). In order to "determine whether the sentence 'is unreasonable,' with regard to the § 3553(a) factors," as *Booker* instructs, 543 U.S. at 261, we must evaluate how a district court has weighed and balanced those § 3553(a) factors. *See Rita*, 2007 WL 1772146, at *17 (Stevens, J., concurring) (explaining that § 3553(a) authorizes sentencing judges to consider the history and characteristics of the defendant and that "[a]s such, they are factors that an appellate court must consider under *Booker*'s abuse-of-discretion standard"). An appellate court's independent analysis of the § 3553 (a) factors and a sentence's consistency with those factors does not constitute *de novo* review. That analysis is part and parcel of reasonableness review. *Booker*, 543 U.S. at 261. ("[The § 3553(a)] factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."). We cannot determine whether a district court gave "meaningful consideration" to the § 3553(a) factors without giving meaningful consideration to those factors ourselves.

As an alternative to our approach, the dissent proposes an exceedingly limited, procedurally focused review that would require us to subordinate our own analysis of a sentence's substantive compliance with the § 3553(a) factors to the District Court's analysis. *See* Dissenting Op. at 49 ("The majority would, apparently, have applied these factors differently had it been the sentencing court. I would have done so as well."); *id.* at 39 ("I do not believe it presumptuous to state that each member of this panel, if sitting as a district judge, would have sentenced William Tomko to time in prison."). Such an approach, in which appellate courts refrain from exercising any

16

judgment regarding the appropriate substantive application of the § 3553(a) factors, amounts to an abdication of review, not reasonableness review. The upshot of the dissent's approach would be a system of non-review nearly indistinguishable from the toothless pre-Sentencing Reform Act application of the abuse of discretion standard, which left district court discretion nearly unbounded and appellate courts effectively out of the loop. The remedial opinion in *Booker* was careful to reject a return to such an application, warning that "eliminat[ing] appellate review entirely, would cut the statute loose from its moorings in congressional purpose." *Id.* at 262.

Substantive review of the sentence itself, as well as the procedure used to fashion it, is necessary if we are to fulfill the vital role *Booker* envisioned for appellate review. *See Rita*, 2007 WL 1772146, at *17 (Stevens, J., concurring) ("I believe that [a] purely procedural review . . . is inconsistent with our remedial opinion in *Booker*, which plainly contemplated that reasonableness review would contain a substantive component. After all, a district judge who gives harsh sentences to Yankees fans and lenient sentences to Red Sox fans would not be acting reasonably even if her procedural rulings were impeccable."). Furthermore, we do not believe our own precedent supports the procedurally oriented approach the dissent advocates. *See*, *e.g.*, *Grier*, 475 F.3d at 569 ("The Supreme Court explained in Booker that review for 'reasonableness' is meant to assess *the ultimate sentence impose[d]*, to determine whether the sentencing judge gave meaningful consideration to the factors of 18 U.S.C. § 3553(a).") (emphasis added). We "assess the ultimate sentence imposed," not only the procedure used to fashion it, as the sentence itself is a reflection of the sentencing

17

While "reasonableness is a range, not a point," *Cooper*, 437 F.3d at 332 n.11 (quoting *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005)), a range by definition has both upper and lower limits that will be exceeded in some cases. This case requires us to plumb the lower depths of that range.

## III. DISCUSSION

The Government, as the appellant in this case, bears the burden of establishing that the sentence imposed is unreasonable in light of both the record and the § 3553(a) factors. *Id.* at 332. The Government states that the "bottom line" in this case is "that a rich defendant was allowed to buy his way out of a prison sentence." While we resist such ad hominem arguments and do not think the finer issues presented by this appeal can be so bluntly summarized, we do share what we perceive to be the

---

court's application of the § 3553(a) factors. *See Rita*, 2007 WL 1772146, at *1 ("The federal courts of appeals review federal *sentences* and set aside those they find 'unreasonable.'") (emphasis added). If the substance of a sentence is "illogical and inconsistent" with the § 3553(a) factors, we cannot conclude that the sentence is a reasonable one merely because the sentencing court has adhered to procedural directives. To put it figuratively, there is a recipe for reasonableness that in many, if not most cases, will lead to a palatable result, and we are not in a position to protest if the result is a little too sweet or bitter for our taste. However, when a number of key ingredients prescribed by that recipe are obviously missing from the mix, we cannot ignore the omission and feign satisfaction – we are obliged to point out there is no proof in the pudding.

18

underlying sentiment of the Government's appeal.  That is, a defendant who committed a very serious offense "did not receive so much as a slap on the wrist – it was more like a soft pat."  *Crisp*, 454 F.3d at 1291.  As will more fully explain, we believe the sentence imposed in this case is unreasonable in light of the facts and circumstances revealed in the record and the § 3553(a) factors.

A.

The recommended Guidelines sentencing range for the offense in this case was twelve to eighteen months of incarceration.  Although the Guidelines are advisory, they must still be afforded due weight as a factor under § 3553(a)(4).  In addition, the Guidelines continue to be a vital force in sentencing as they "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives."  *Rita*, 2007 WL 1772146, at *8.  *See also id.* ("[The Commission] has tried to embody in the Guidelines the factors and considerations set forth in § 3553(a)."); *id*. at *7 ("The upshot is that the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives, the one, at retail, the other at wholesale.").  When the Guidelines, "drafted by a respected public body with access to the best knowledge and practices of penology, recommend that a defendant be sentenced to a number of years in prison, a sentence involving no . . . imprisonment can be justified only by a careful, impartial weighing of the statutory sentencing factors."  *United States v. Goldberg*, __ F.3d __, 2007 WL 1827645, at *5 (7th Cir. June 27, 2007).

19

Notably, the Guidelines and its policy statements, themselves both separately applicable as § 3553(a) factors, in this case reiterate and reinforce the sentencing mandate of § 3553(a)(2), which directs the district courts to consider "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, [] to provide just punishment for the offense . . . [and] to afford adequate deterrence to criminal conduct. . . ." § 3553(a)(2)(A)-(B). Guidelines policy statements, relevant under § 3553(a)(5) (requiring consideration of "any pertinent policy statement . . . issued by the Sentencing Commission . . . that . . . is in effect on the date the defendant is sentenced"),[8] emphasize the seriousness of the offense of tax evasion, § 3553(a)(2)(A), observing:

> Under pre-guidelines sentencing practice, courts sentenced to probation an inappropriately high percentage of offenders guilty of economic crimes, such as theft, tax evasion, antitrust offenses . . . that in the Commission's view are 'serious'. . . .

---

[8]The District Court referred to the 1997 Guidelines Manual in its sentencing of Tomko. "While ordinarily a guideline in effect at the time of sentencing will govern, a defendant may not be prejudiced by a change in a guideline after he commits an offense. Accordingly, when the guideline in effect at the time of the offense is more favorable to the defendant, it must be applied." *United States v. McAllister*, 927 F.2d 136, 138 n.2 (3d Cir. 1991). Accordingly, all references in this opinion are to the 1997 edition of the Guidelines Manual.

20

The Commission's solution to this problem has been to write guidelines that classify as serious many offenses for which probation previously was frequently given and provide for at least a short period of imprisonment in such cases.

U.S.S.G. Manual ch.1, pt.A, intro. cmt. 4(d).

In addition, Guidelines policy statements underscore the need for tax prosecutions to provide just punishment and promote respect for the law, § 3553(a)(2)(A), and provide for deterrence, § 3553(a)(2)(B):

Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. Manual ch.2, pt.T, intro. cmt. (1997).

We share with the Government concern about the message a sentence of probation for the indisputably serious offense of willful tax evasion sends to the public at large and would-be violators. Tomko's sentence of probation included

21

home confinement in the very mansion built through the fraudulent tax evasion scheme at issue in this case – an 8,000-square-foot house on approximately eight acres, with a home theater, an outdoor pool and sauna, a full bar, $1,843,500 in household furnishings, and $81,000 in fine art. The perverse irony of this gilded cage confinement was not lost on the Government, it is not lost on us, and it would not be lost on any reasonable public observer of these proceedings, including those would-be offenders who may be contemplating the risks associated with willful tax evasion. Under the circumstances, a sentence of probation does not reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, § 3553(a)(2)(A), or provide adequate deterrence.[9] § 3553(a)(2)(B).

---

[9]The District Court did consider the need to afford adequate deterrence to the defendant's criminal conduct, *i.e.*, "specific deterrence." However, neither the record nor the sentence reflects meaningful consideration of the equally important need to deter others, *i.e.*, "general deterrence." Even if the Guidelines did not so clearly articulate this need to provide for general deterrence in tax evasion cases, our Court has recognized that § 3553(a) requires the sentence imposed to be "minimally sufficient to satisfy concerns of retribution, *general deterrence*, specific deterrence, and rehabilitation." *United States v. Serafini*, 233 F.3d 758, 776 (3d Cir. 2000) (citation omitted) (emphasis added). We do not suggest that more explanation by the District Court solely on the subject of deterrence would have satisfied us that the sentence in this case is reasonable.

22

The Government argues that in this case "real deterrence is jail," and this position finds support in *United States v. Ture*, 450 F.3d 352 (8th Cir. 2006). The underlying facts of *Ture* and our own case are nearly identical. Ture, like Tomko, induced others to disguise income as deductible corporate expenses. *Id.* at 354. This failure to report funds as income led to a tax deficiency of $240,252 in Ture's case, *id.* at 355, whereas in Tomko's case the stipulated tax deficiency was $228,557. Finally, in both cases the Guidelines range was twelve to eighteen months and both district courts sentenced the defendants to probation and community service rather than imprisonment. Concluding that the district court's granting of a downward variance was unreasonable, the Eighth Circuit noted that "[a]s the Guidelines explain, willful tax evaders often go undetected such that those who are caught . . . evading nearly a quarter-million dollars in tax must be given some term of imprisonment." *Id.* at 358. It reasoned that, in the case of willful tax evaders, "[t]he goal of deterrence rings hollow if a prison sentence is not imposed . . . ." *Id.*

The Second Circuit has also had occasion to consider the negative implications of sentencing white collar criminals to terms of probation rather than imprisonment. In *United States v. Rattoballi*, 452 F.3d 127 (2d Cir. 2006), the defendant pleaded guilty to antitrust law violations. The recommended Guidelines range was twenty seven to thirty three months but the district court imposed a sentence consisting of five years probation, including one year of home confinement, and $155,000 in restitution. *Id.* at 135. In reversing and remanding that judgment of sentence, the Second Circuit took note of the Sentencing Commission's considered judgment that "jail terms

23

are ordinarily necessary for antitrust violations because they 'reflect the serious nature of and the difficulty of detecting such violations.'" *Id.* at 136 (quoting Amendments to the Sentencing Guidelines for United States Courts, 56 Fed. Reg. at 22,775 (1991)).

We find the reasoning of *Ture* and *Rattoballi* persuasive. Although the sentence in this case, like the sentence in *Ture*, represents "in effect, a 100% downward variance from the Guidelines range," 450 F.3d at 357, our focus is on the qualitative, rather than quantitative, significance of this variance. The result here means Tomko avoids serving time in a federal prison, a result which, as we have already stated, we believe is inconsistent with the overarching sentencing goals outlined in § 3553(a)(2)(A)-(B).

Section 3553(a)(6) further directs sentencing courts consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." The Guidelines elaborate on this theme, explaining:

> Under pre-guidelines practice, roughly half of all tax evaders were sentenced to probation without imprisonment, while the other half received sentences that required them to serve an average prison term of twelve months. This guideline is intended to reduce disparity in sentencing for tax offenses and to somewhat increase average sentence length. As a result, the number of purely probationary sentences will be reduced. The

24

> Commission believes that any additional costs of imprisonment that may be incurred as a result of the increase in the average term of imprisonment for tax offenses are inconsequential in relation to the potential increase in revenue.

U.S.S.G. Manual § 2T1.1 cmt. background.

The District Court stated on the record that "it recognized the need for consistent sentencing" but imposed a sentence that contributes to rather than reduces the marked disparity referred to by the Commission. Furthermore, to the extent that the District Court explained that such a sentence was warranted by mitigating factors, as we discuss *infra* II.B, these mitigating factors failed to distinguish Tomko from other "defendants with similar records . . . found guilty of similar conduct." Thus, we cannot conclude that the sentence imposed in this case is logical and consistent with § 3553(a)(6).

In addition, it is clear from the record that Tomko's was no garden variety tax evasion offense. Tomko's scheme spanned over a number of years, involved the planning, coordination, and coercion of multiple individuals, required a sophisticated scheme of concealment through fraudulent billing, and resulted in a stipulated tax loss of over $225,000.[10] Further,

---

[10]The disputed portion of the record included evidence that Tomko's fraudulent scheme extended to the construction of his Maryland vacation home. The Government presented evidence that Tomko on more than one occasion told individuals that this vacation home was "a gift from Uncle Sam." The

the issue of whether the "leadership role" enhancement requested by the Government was properly denied is not before us and we do not conclude, as the Government has suggested, that the District Court's failure to rule on this disputed portion of the record may form the sole basis of remand in this case.[11]

Viewed cumulatively, we conclude that the § 3553(a) factors advocate in the strongest possible terms for a sentence including a term of imprisonment. Swimming against this

_____

Government argues that this portion of the record is relevant insofar as it provides further evidence of Tomko's past history of and propensity for tax evasion. In addition, the Government argues that this evidence underscores the need for a more rigorous sentence to provide for adequate deterrence. However, the Government was unable to provide reliable figures to account for the significance of this alleged fraud to the computed tax loss to the Government. Because this disputed portion of the record apparently did not factor into the District Court's judgment of sentence, it does not factor into our analysis.

[11]The Government cites an unpublished opinion of the Court as authority for this proposition. We must restate that we continue to decline to cite to our not precedential opinions as authority. As we have emphasized so often in the past, such opinions are not regarded as precedents that bind the Court because they do not circulate to the full Court before filing.

26

strong tide, the District Court concluded a downward variance[12] was merited in Tomko's case because of (1) his negligible criminal history, (2) his record of employment, (3) his support for and ties in the community, and his extensive charitable work; and (4) a combination of these factors.

Under the circumstances, our review of the District Court's consideration of these mitigating factors takes on greater significance. By this statement, we do not mean to suggest a formulaic application of the "proportionality principle" that has been adopted by so many of our sister circuits. However, we do believe that closer appellate scrutiny of sentences that deviate from the norm is necessary to prevent the unwarranted disparities that bedeviled the pre-Sentencing Reform Act discretionary sentencing regime and prompted reform. *Booker*, 543 U.S. at 253; *see also id.* at 255 ("Congress enacted the sentencing statutes in major part to achieve greater uniformity in sentencing"); *id.* at 263 (emphasizing that unreasonableness review will play a central role in advancing Congress's original

---

[12]Our Court distinguishes between traditional departures based on a specific Guidelines provision and sentencing "variances" from the Guidelines that are based on *Booker* and the § 3553(a) factors. *United States v. Vampire Nation*, 451 F.3d 189, 195 n.2 (3d Cir. 2006). The District Court in this case did not grant Tomko a downward departure based on his charitable acts but rather took them into consideration as a mitigating factor in the course of its *Cooper* Step 3 analysis of § 3553(a). We treat the Court's failure to rule on a departure motion as a de facto denial. *United States v. Colon*, 474 F.3d 95, 99 n.8 (3d Cir. Jan. 29, 2007).

aim in enacting the Sentencing Reform Act because it will "tend to iron out sentencing differences"). While we recognize that the District Court is entitled to great deference in sentencing post-*Booker*, we also must be mindful of the deference we owe to Congress and its "basic statutory goal" of diminishing unwarranted sentencing disparity.[13] *Id.* at 256. If sentences that vary substantially from the norm based on facts that are plainly unexceptional are allowed to proliferate, we will fail to fulfill our role in moving sentencing in the direction of uniformity, as *Booker* envisioned.

## B.

The Government argues that reliance on Tomko's negligible criminal history as a mitigating factor was inappropriate insofar as negligible criminal history is already factored into his base offense level. *See* U.S.S.G. Manual § 4A1.3 cmt. background ("[T]he lower limit of the range for

---

[13]The remedial portion of the opinion in *Booker* emphasizes that the primary objective of Congress in sentencing reform was to reduce sentence disparity. *See*, *e.g.*, 543 U.S. at 255 ("Congress enacted the sentencing statutes in major part to achieve greater uniformity in sentencing . . . ."); *id.* at 264 ("avoiding unwarranted sentencing disparities" is part of "Congress' initial and basic sentencing intent"). *Booker* also instructs that "[t]he courts of appeals review sentencing decisions for unreasonableness," and in so doing, "move sentencing in Congress' preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary." *Id.*

the Criminal History Category I is set for a first offender with the lowest risk of recidivism. Therefore, a departure below the lower limit of the guideline range . . . on the basis of the adequacy of criminal history cannot be appropriate."); *Koon v. United States*, 518 U.S. 81, 111 (1996) (noting the Commission already took low risk of recidivism into account in formulating the criminal history category). However, given the flexible nature of the sentencing scheme post-*Booker*, we cannot conclude it is unacceptable for the same facts to be used both to set the Guidelines range and to apply the other § 3553(a) factors.[14]

The Seventh Circuit had opportunity to address the identical issue that arises in this appeal, and reasoned "if *Booker* means anything at all, it must mean that the court was permitted to give further weight to a factor covered by a specific

---

[14]We agree with the dissent that § 3553(a)(1) specifically instructs sentencing courts to consider "the nature and circumstances of the offense and the history and characteristics of the defendant," and does not state that this factor must be excluded if a district court gives a defendant a sentence with a significant variance. However, we disagree with the dissent that we are without authority to review the extent to which the District Court's consideration of the history and characteristics of a defendant is consistent with the overall sentencing goals and directives of § 3553(a). *See Rita*, 2007 WL 1772146, at *17 (Stevens, J., concurring) (explaining that because history and characteristics of the defendant are factors the district court is authorized to consider, they "are factors that an appellate court must consider under *Booker*'s abuse-of-discretion standard").

29

guidelines adjustment, especially where (as is true here) that factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." *United States v. Wallace*, 458 F.3d 606, 613 (7th Cir. 2006) (internal quotation marks, citations omitted).[15] We believe that *Wallace*'s explication of a situation in which a § 3553(a) factor (here, § 3553(a)(1)) is persuasive. However, while negligible criminal history may have been an appropriate factor for the sentencing court to consider, on its own it does not provide strong support for the variance in this case, given that it was already factored into Tomko's base offense level.

Similarly, record of employment is relevant as an aspect of a defendant's history and characteristics. Under the Guidelines, courts have traditionally been discouraged from considering a defendant's education and vocational skills in sentencing. *See* U.S.S.G. Manual § 5H1.2. The Guidelines position on this factor, however, is difficult to square with the *Booker* imperative that sentencing courts are to give meaningful consideration to all of the factors under § 3553(a). Certainly, an individual's record of employment is relevant to that analysis. More importantly, as we have already emphasized, the Guidelines are a factor in sentencing, not a mandate. *United States v. Gunter*, 462 F.3d 237, 249 (3d Cir. 2006). Therefore,

[15]The Government in *Wallace* had argued that "the district judge was mistaken to rely on Wallace's remorse and lack of criminal history, because the guidelines already accounted for both through a downward adjustment for acceptance of responsibility and the Category I criminal history." 458 F.3d 606, 613.

30

it is appropriate to consider record of employment as a mitigating factor in sentencing, and in some cases may be justified as fair consideration of a defendant's "history and characteristics" under § 3553(a)(1). *See Rita*, 2007 WL 1772146, at \*17 (Stevens, J., concurring) ("Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civic, charitable, or public service are not ordinarily considered under the Guidelines [but are] matters that § 3553(a) authorizes the sentencing judge to consider.").

The Government argues, however, that in this particular case the District Court's granting Tomko a variance in part because of his record of employment is "inconsistent with its finding that defendant had threatened the contractors with nonpayment and lost business opportunities unless they submitted falsified invoices as defendant instructed." Appellant's Br. 19. Admittedly, this finding creates considerable tension. However, the District Court also heard evidence that presented Tomko as "a person with a high school education who built a multi-million dollar company and hires [] 300 people and looks after them like family." In addition, at sentencing proceedings, counsel proffered testimony from Tomko, Inc.'s chief financial officer stating that Tomko's absence from the company could place Tomko, Inc. in financial trouble.

However, like negligible criminal history, this factor is certainly not in itself a reasonable basis for the sentence in this case. An admirable record of employment is a characteristic

31

common to many white-collar criminals and we are "disinclined to accord the prospect of business failure decisive weight when it is a direct function of a criminal investigation that had its origins in the defendant's own unlawful conduct." *Rattoballi*, 452 F.3d at 136; *United States v. Sharapan*, 13 F.3d 781, 785 (3d Cir. 1994) ("[W]e see nothing extraordinary in the fact that the imprisonment of the principal [of the business] for mail fraud and filing false corporate tax returns may cause harm to the business and its employees. The same is presumably true in a great many cases in which the principal of a small business is jailed for comparable offenses . . . ."); *U.S. v. Reilly*, 33 F.3d 1396, 1424 (3d Cir. 1994) ("[W]e see nothing extraordinary in the fact that [the defendant's] conviction may harm not only his business interests but also those of his family members.").

Finally, the District Court relied heavily on Tomko's community ties and purportedly extensive charitable work. The Guidelines provide that a defendant's charitable works are "not ordinarily relevant," and discourage downward departures from the normal sentencing range based on good works – that is, civic, charitable, or public service. *See* U.S.S.G. Manual § 5H1.11. We must note, however, that consideration of such good works is not specifically prohibited, and, especially in the post-*Booker* world, we believe it is well within the discretion of a sentencing judge to consider such factors.[16]

---

[16]Although not so stated by the District Court, a defendant's charitable work and support in the community, like record of employment, may be considered under the rubric of § 3553(a)(1), which requires that a sentence imposed reflect "the history and characteristics of the defendant."

Under the Guidelines, departures for charitable work are recommended only when the good works are "exceptional." *See* U.S.S.G. Manual ch. 5, pt. H, introductory cmt. (departures based on discouraged factors should occur only "in exceptional cases"); *see also United States v. Serafini*, 233 F.3d 758, 775 (3d Cir. 2000) (explaining that in order to be entitled to a downward departure for good works, a defendant's civic service, charity, and philanthropy must be "beyond the norm," *i.e.*, "exceptional," for a person with his or her resources and social status). We considered downward departures based on charitable factors in *U.S. v. (Fred E.) Cooper*, 394 F.3d 172 (3d Cir. 2005). In our case, however, as previously stated, a variance rather than a departure is at issue. In addition, *(Fred E.) Cooper* was decided prior to *Booker* and *Cooper* under a de novo standard of review. Nonetheless, the case is still relevant and persuasive, *see United States v. Jackson*, 467 F.3d 834, 839 (3d Cir. 2006) ("[O]ur Circuit's pre-*Booker* case law . . . continues to have advisory force."), and provides valuable insight.

In *(Fred E.) Cooper*, the defendant was convicted of various offenses related to an abuse of his position as chief executive and financial officer of a large corporation. At his sentencing hearing, the district court heard testimony and received letters describing defendant's various charitable activities, which included organizing and coaching a youth football team in a depressed area, mentoring team members, paying the cost for several of them to attend a better high school, and assisting one of the team members to attend college. The district court granted the defendant a four-level downward departure for these charitable activities, finding that his acts

33

were "hands-on personal sacrifices" that had a dramatic and positive impact on the lives of others and that were exceptional. 394 F.3d at 173-74.

On appeal, we noted that "more is expected of 'high-level business executives' who enjoy sufficient income and community status so that they have the opportunities to engage in charitable and benevolent activities" and that "it is usual and ordinary, in the prosecution of similar white-collar crimes involving high-ranking corporate executives . . . to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts." *Id.* at 176-77 (citations omitted). And although we upheld the district court's decision, we affirmed that the relevant inquiry is whether the proffered charitable activities are "exceptional enough to overcome the judgment of the Sentencing Commission that a record of good works is a discouraged basis for departure." *Id.* at 177.

Furthermore, the *(Fred. E.) Cooper* dissent was even more demanding, stating "it cannot be said that Cooper's civic acts were in any way 'extraordinary' when compared to other cases involving similarly-situated defendants presenting charitable acts." *Id.* at 181. In addition, the dissent voiced its suspicion of the motives for some of the defendant's charitable activities noting that he did not begin some of his charitable work until after the inception of the investigation that led to the conviction. *Id.* ("This timing, of course, calls into question the true impetus undergirding Cooper's charity."). Invoking the *(Fred E.) Cooper* dissent, the Government alleges that Tomko's work for Habitat for Humanity was contrived as a "crass effort to improve defendant's sentence." Appellant's Br. 23. This

34

allegation finds support in Tomko's own concession that he began working on this community project as he was anticipating that community service might be required of him.

However, the District Court also reviewed more than fifty letters of support, most of which paint a picture of Tomko as a man with great concern for his employees and his community. Some attest to truly admirable acts of kindness. However, simply "being a 'good person,' a quality indeed to be admired, does not qualify as extraordinary or exceptional civic or charitable conduct." *Serafini*, 233 F.3d at 773. Furthermore, the Government views these letters with jaundiced eyes, noting that many if not most of these letters were from Tomko's own employees and that one might expect such individuals to be easily "persuaded" to pen arguably overwrought letters of support and concern.

We find it unnecessary to weigh in with our own cynical speculations as to the underlying motives of the authors of these letters, as we find that Tomko's "support in the community" and "charitable work" simply did not justify the variance that was granted in this case. Even assuming arguendo the purest of motives for Tomko's well timed interest in Habitat for Humanity, and viewing as completely altruistic the letters attesting to his beneficence, this single factor fails to justify the downward variance granted in this case. As a number of our sister circuits have recognized, "unjustified reliance upon any one [§ 3553(a)] factor is a symptom of an unreasonable sentence." *Rattoballi*, 452 F.3d at 137 (2d Cir. 2006); *accord United States v. Hampton*, 441 F.3d 284, 288-89 (4th Cir. 2006);

35

*United States v. Givens*, 443 F.3d 642, 646 (8th Cir. 2006); *United States v. Cage*, 451 F.3d 585, 594-95 (10th Cir. 2006).

Viewed cumulatively, the three factors considered by the District Court as mitigating factors – negligible criminal history, support and ties in the community and charitable work, employment record – pale in comparison to the numerous § 3553(a) factors suggesting that a term of imprisonment is warranted in cases of tax evasion as willful and brazen as Tomko's. A sentence of mere probation, in light of these factors, is unreasonable and it was an abuse of discretion for the District Court to impose it. We do not rule that any below-Guidelines sentence would have been improper in this case, only that the District Court abused its discretion in rendering this particular below-Guidelines sentence. The new advisory Guidelines regime leaves ample room for discretion on the part of the District Court, but "discretion, like the hole in the doughnut, does not exist except as an area left open by a surrounding belt of restriction." *Compagnie des Bauxites de Guinea v. Insurance Co. of North Am.*, 651 F.2d 877, 884 (3d Cir. 1981) (quoting R. Dworkin, Taking Rights Seriously 31 (1977)).

Furthermore, we disagree with the dissent that the hefty fine imposed on Tomko mitigates the unreasonableness of the sentence in this case. Such a justification for leniency in sentencing only reinforces the perception that wealthy defendants can buy their way out of a prison sentence, and is inconsistent with Congress's clear intent, as expressed in the Sentencing Reform Act and § 3553(a), to reduce unwarranted disparities in sentencing, so often based on socio-economic

36

status. *See*, *e.g.*, *United States v. Harpst*, 949 F.2d 860, 863 (6th Cir. 1991) ("[P]ermitting greater leniency in sentencing in those cases in which restitution is at issue and is a meaningful possibility (i.e., generally white-collar crimes) would, we believe, nurture the unfortunate practice of disparate sentencing based on socio-economic status, which the guidelines were intended to supplant."); *United States v. Seacott*, 15 F.3d 1380, 1389 (7th Cir. 1994) ("Allowing sentencing courts to depart downward based on a defendant's ability to make restitution would thwart the intent of the guidelines to punish financial crimes through terms of imprisonment by allowing those who could pay to escape prison. It would also create an unconstitutional system where the rich could in effect buy their way out of prison sentences.").

## IV. CONCLUSION

Our touchstone in reviewing sentences post-*Booker* is "reasonableness" and a below-Guidelines sentence will not always be an unreasonable one. However, even below-Guidelines sentences must be logical and consistent with the sentencing goals articulated in § 3553(a). The sentence in this case was not. As such, it is unreasonable and the District Court abused its discretion in imposing it. We will vacate the judgment of the District Court and remand for resentencing in accordance with this opinion.

Smith, *Circuit Judge*, *dissenting*.

I do not believe it presumptuous to state that each member of this panel, if sitting as a district judge, would have sentenced William Tomko to time in prison. However, this Court does not review sentences de novo. Instead, we afford "deference to the District Court because it is in the best position to determine the appropriate sentence in light of the particular circumstances of the case." *United States v. Dragon*, 471 F.3d 501, 506 (3d Cir. 2006) (quotation omitted). Post-*Booker*, reasonableness review is the standard, and it "merely asks whether the trial court abused its discretion." *Rita v. United States*, --- U.S. --- , 127 S.Ct. 2456, 2465 (2007); *see also id*. at 2470-71 (Stevens, J., concurring) ("Simply stated, *Booker* replaced the de novo standard of review required by 18 U.S.C. § 3742(e) with an abuse-of-discretion standard that we called 'reasonableness' review." (citation omitted)). *Rita* reminds us that the Guidelines "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives," *id*. at 2465, and that the Sentencing Commission has carried out the objectives at "wholesale." *Id*. at 2463. The sentencing judge, in contrast, carries out the § 3553(a) objectives at "retail," *id*., so that "[t]he sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than the Commission or the appeals court." *Id*. at 2469.

In this case, the District Court provided a thorough discussion of how it meaningfully considered the factors outlined in 18 U.S.C. § 3553(a), and then reasonably applied

38

them to the facts of the case before it.  The majority disagrees and, in doing so, makes at least three major errors.

First, the majority adopts a rigid version of the proportionality principle in the guise of its formulation of substantive reasonableness that has never been employed by this Court.  The proportionality principle is "the proposition that the strength of the justification needed to sustain an outside-Guidelines sentence varies in proportion to the degree of the variance."  *Rita*, 127 S.Ct. at 2467.  The appropriateness of such a principle will be taken up by the Supreme Court next term in *United States v. Gall*, No. 06-7949.  Perhaps to avoid the obvious conclusion that we should hold this case c.a.v. pending the resolution of *Gall*, the majority instead states that, in its reasoning, "we do not mean to suggest a formulaic application of the 'proportionality principle' that has been adopted by so many of our sister circuits."  Maj. Op. at 28.  Yet the majority implicitly adopts such a principle by concluding that the sentence in this case, which varies from the Guidelines, is unreasonable because it concludes "that the § 3553(a) factors advocate in the strongest possible terms for a sentence including a term of imprisonment."  Maj. Op. at 27.  In other words, the majority attempts to circumvent the proportionality principle by arguing that the substance of Tomko's sentence must be unreasonable because the sentence falls outside the majority's application of the § 3553(a) factors.  This reasoning parallels the proportionality principle and even goes beyond the version of the proportionality principle which requires a sentencing judge

39

to find extraordinary circumstances to justify a substantial variance, which is the question presented in *Gall*.[17]  The majority suggests that even an extraordinary circumstance finding would not have been enough for the District Court to justify its sentence in this case.  The majority says this is because the crime was so egregious and the variance was so great.  Respectfully, this sounds to me like proportionality.

Second, the majority departs from our post-*Booker* jurisprudence by conducting what amounts to de novo review of the sentencing court.  In no post-*Booker* case has this Court ever asked a sentencing court to do more than the District Court did here.  The majority opinion curtails the deference we accord sentencing courts to impose a reasonable sentence, regardless of whether that sentence substantially varies either up or down from the Guidelines range.

Third, and related to the first two errors I cite, the majority's position provides no guidance for district courts. The effect of the majority opinion will necessarily be to confuse

_____

[17] The question presented in *Gall* is "[w]hether, when determining the 'reasonableness' of a district court sentence under *United States v. Booker*, 543 U.S. 220 (2005), it is appropriate to require district courts to justify a deviation from the United States Sentencing Guidelines with a finding of e x t r a o r d i n a r y   c i r c u m s t a n c e s . "    *S e e* http://www.supremecourtus.gov/qp/06-07949qp.pdf   (last accessed August 14, 2007).

40

district courts as to what circumstances would *ever* justify a substantial variance, regardless of the validity of the reasons for the variance given by the sentencing court.[18]  This effect runs contrary to both the deference formerly granted to sentencing courts as well as our appellate role of examining the legitimacy of the reasons given by the sentencing court for exercising its decisionmaking discretion.  *See Rita*, 127 S.Ct. at 2468 ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); *United States v. Charles*, 467 F.3d 828, 833 (3d Cir. 2006) (describing "the high level of deference we accord sentencing judges").  Further, I suggest that the majority's reasoning applies with equal force to aggravated factors counseling in favor of substantial upward variations, so that the majority's holding has the potential for unintended consequences falling outside its reasoning.

Because I believe that the majority fashioned a new standard for reasonableness unsupported by precedent, failed to accord the District Court appropriate deference under our post-*Booker* jurisprudence, and failed to show how the District Court abused its discretion, I respectfully dissent.  I would affirm the

---

[18]A district court will also face the difficult task of determining when a variance is substantial.  In this case, for example, the difference between Tomko's actual sentence and the lower end of his Guidelines range is only 12 months.

sentence of the District Court because it is reasonable in light of the District Court's discussion of the circumstances of this case and the sentencing factors outlined in 18 U.S.C. § 3553(a).

I.

The majority appropriately characterizes William Tomko's scheme to defraud the Government of federal income taxes. He is a tax cheat, and an unsympathetic one. His crime resulted in a tax deficiency of over $225,000. The Sentencing Guidelines suggested a sentencing range of 12 to 18 months of incarceration and a fine range of $3,000 to $30,000. The District Court sentenced Tomko to three years of probation (including one year of house arrest), 250 hours of community service, and the statutory maximum fine of $250,000. The District Court also ordered him to undergo 28 days of in-house treatment for alcohol abuse.

The Supreme Court's decision in *Booker* holding that the federal Sentencing Guidelines are advisory represented a tectonic shift in federal sentencing. *United States v. Booker*, 543 U.S. 220 (2005); *United States v. Grier*, 475 F.3d 556, 565 (3d Cir. 2007) (en banc) (stating that the Guidelines range now "merely serves as one of a number of factors to be considered in fashioning the ultimate sentence"). The Supreme Court stated that appellate courts are to review sentences for "reasonableness" in light of the factors enumerated in 18 U.S.C. § 3553(a), but granted considerable leeway to the appellate

42

courts to define reasonableness. *Booker*, 543 U.S. at 261-62. In *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006), we stated that sentencing courts must give "meaningful consideration to the § 3553(a) factors" and "ascertain whether those factors were reasonably applied to the circumstances of the case." The party challenging the sentence has the burden of demonstrating unreasonableness. *Id*. at 332. This Court does not presume that a sentencing court considered the factors solely because the sentence falls within the Guidelines range, *id*. at 329-30, which is still valid post-*Rita*. *See Rita*, 127 S. Ct. at 2462 (stating that the primary issue "is whether a court of appeals *may* apply a presumption of reasonableness" to a within-Guidelines sentence (emphasis added)). Where, as here, a sentence falls outside of the Guidelines range, we also do not presume that the sentence is unreasonable. *See United States v. Schweitzer*, 454 F.3d 197, 204 (3d Cir. 2006). The Supreme Court will take up this question next term in *United States v. Gall*, No. 06-7949.

The majority, in my view, fails to recognize the length to which the District Court properly gave meaningful consideration to the § 3553(a) factors and reasonably applied them to Tomko. The District Court in the September 2005 sentencing hearing gave ample consideration to the factors:

> I am to consider first the nature and circumstances of the offense, which are as follows. The offense was not violent in nature. The offense was not

43

ongoing in nature. The offense was not part of a larger pattern of criminal activity. There are also no identifiable victims of the offense. I am also to consider the history and characteristics of the Defendant. [The District Court here discussed Tomko's childhood, family, education, drinking problem, and prior criminal conviction for operating a boat while intoxicated.] I am also going to consider the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the rule of law, and provide just punishment for the offense. Here, the Defendant has pled guilty to tax evasion, which is a serious offense. I am to afford adequate deterrence to the Defendant's criminal conduct. Here, the Defendant has one prior criminal incident which is alcohol-related, but has otherwise led a crime-free life. I am to protect the public from further crimes of this Defendant. Here, the Defendant has not been involved in other crimes even though this is a serious offense here. The likelihood of recidivism in this case I find is very little. And to provide Defendant with needed educational/vocational training, medical care, or other correctional treatment in the most effective manner possible. I am also to consider the kind of sentences available, including federal prison, house arrest, probation and fines, which I

am going to do. I am to consider the need for unwarranted sentence disparities among Defendants with similar records who have been found guilty of similar conduct. These considerations generally weigh in favor of sentencing a Defendant within the guideline range. However, this need to avoid unwarranted sentence disparities among Defendants with similar records also gives me enough leniency, though, to understand that there are differences and those differences have to be taken into account. *I recognize the need for consistent sentencing; however, in this case, given the Defendant's lack of any significant criminal history, his involvement in exceptional charitable work and community activity, and his acceptance of responsibility, we find that a sentence that is mitigated by the factors of 3553 [is] warranted.*

The District Court explicitly examined subsections (a)(1), (a)(2)(A), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(3), (a)(4), and (a)(6) of § 3553. The District Court also ordered restitution. *See* 18 U.S.C. § 3553(a)(7).

In addition to the previously quoted passage, the District Court also stated:

45

The reason for the sentence is as follows: Defendant stands before us for sentencing after pleading guilty to tax evasion. A review of Defendant's financial condition paints a picture of a very wealthy man who had the means and wherewithal to easily pay whatever tax obligation is owing. He was a successful businessman earning a significant salary. There is simply no reason for him to have done this.

This being said, I also note his negligible criminal history, his record of employment, his support for and ties in the community, and the extensive charitable work he has done. I have also – therefore, I have sentenced him to the period of probation, which I recognize is below the guideline range. I also recognize that the fine is above the guideline range. Given the Defendant's wealth, the guideline range in fines is insufficient deterrence.

Therefore, I've done this mitigation of the sentence under the provisions set forth in 18 U.S.C. § 3553 for the reasons I stated. Taking all these factors into account, the Court sentences the Defendant to a period of probation, a substantial fine, and allows for repayment to the Internal Revenue Service of his outstanding tax obligation.

*The Court views that this sentence will address the sentencing goals of punishment, deterrence and rehabilitation*.

As this passage indicates, the District Court gave meaningful consideration to the § 3553(a) factors and reasonably applied them to the particular facts of Tomko's case. *Cf. United States v. Jackson*, 467 F.3d 834, 842 (3d Cir. 2006) (upholding a sentence where the District Court gave far less explicit consideration to the factors).

In determining whether a sentencing court has reasonably applied the § 3553(a) factors, we review the sentence to ensure that it is both logical and consistent with the factors. *Cooper*, 437 F.3d at 330. Here, the District Court gave specific reasons for why Tomko's sentence varies from the Guidelines range. This variance took into account Tomko's negligible criminal history, community ties, and charitable work as reasons for not incarcerating Tomko, while also factoring in his substantial wealth as a reason for imposing a fine far above the Guidelines range.

The majority would, apparently, have applied these factors differently had it been the sentencing court. I would have done so as well. "That we may ourselves have imposed a sentence different from that of the district court, based on our own de novo assessment of the evidence, is no basis to overturn the judgment." *Schweitzer*, 454 F.3d at 204; *see also United*

47

*States v. Bungar*, 478 F.3d 540, 543 (3d Cir. 2007) (stating that, as an appellate court, we are "highly deferential" when evaluating *Cooper*'s reasonable application prong). Here, the District Court simply weighed the § 3553(a)(1) factors differently from how the members of this panel would have weighed them. For example, the majority states that "while negligible criminal history may have been an appropriate factor for the sentencing court to consider, on its own it does not provide strong support for the variance in this case, given that it was already factored into Tomko's base offense level." Maj. Op. at 31. This is enough for the majority to consider Tomko's sentence unreasonable.

Similarly, the majority discounts Tomko's strong record of employment. The majority correctly states that "record of employment is relevant as an aspect of a defendant's history and characteristics." Maj. Op. at 31. It goes on to conclude, however, that "this factor is certainly not in itself a reasonable basis for the sentence in this case." Maj. Op. at 32. Again, it is not the role of this Court to review a factor de novo when analyzing whether a variance is reasonable. *See Cooper*, 437 F.3d at 330.

The District Court's emphasis on Tomko's "support for and ties in the community, and the extensive charitable work he has done," is also fully supported by the record. Several dozen letters were written on Tomko's behalf prior to his sentencing. These letters indicate that Tomko performed pre-indictment

48

charitable acts that involved not only money, but also his personal time. For several years, Tomko participated in a holiday gift drive in Finleyville, Pennsylvania. He provided Christmas gifts for 30 needy families, provided gloves and scarves to inner city children at a daycare center, and also helped other families in Marianna, Pennsylvania during the holiday season. One letter stated that Tomko performed all of this work anonymously. On a more individual basis, another letter noted how Tomko "also helped a woman in the South Park area that had recently lost her husband and was left with four small children to raise by her[self]." He also went out of his way to accommodate his employees who needed extra time off for personal reasons. Tomko participated in other acts of charity for those in need. A pastor in the community noted Tomko's pre-indictment proclivity for aiding the poor, and stated that "[b]y requiring him to perform ... community service, in lieu of incarceration, not only will you help the impoverished lives of the poor, but you will also transform the life of Bill Tomko."

At Tomko's sentencing proceeding, the Executive Director of Habitat for Humanity's Pittsburgh affiliate testified on Tomko's behalf. The Executive Director stated that the Pittsburgh affiliate had been in danger of being closed down by the national Board of Directors because of its precarious financial situation. The Executive Director testified that Tomko became personally involved in the construction and rehabilitation of several houses in the Pittsburgh area. Again, Tomko devoted not only a portion of his wealth, but also his

personal time.  The Executive Director stated that, for one house that had water runoff problems, "Mr. Tomko came and not only visited with the homeowner, inspected the basement to see what was the matter with the outside of the house, but also worked with the city to determine how best to redirect the water away from the yard.  He put in the grading, he completed the front sidewalk, the back driveway, and put in a curb for the city." The Executive Director gave other examples of Tomko providing his construction expertise to aid the Pittsburgh affiliate.  The Executive Director then testified as to how Tomko could benefit Habitat for Humanity's efforts to build houses for poor families whose residences were damaged or destroyed by Hurricane Katrina.  The Executive Director of the New Orleans affiliate confirmed that Tomko would be useful in these efforts. The Pittsburgh Executive Director concluded her direct testimony by reading a portion of a letter she wrote to the District Court, which stated that "there is no one like Bill Tomko who provides timely, unselfish, and meaningful contributions to Pittsburgh Habitat for Humanity's construction operations."

The majority recognizes that "it is well within the discretion of a sentencing judge to consider" charity.  Maj. Op. at 33.  The majority, though, finds "that Tomko's 'support in the community' and 'charitable work' simply did not justify the variance that was granted in this case," and concludes that "this single factor fails to justify the downward variance granted in this case."  Maj. Op. at 36.

50

In *United States v. Fred E. Cooper*, 394 F.3d 172, 176-78 (3d Cir. 2005), this Court held that a four-level downward departure was warranted because of the defendant's good works that were of a personal nature. *Id.* at 176-78. This departure resulted in three years probation for a defendant who pleaded guilty to one count of securities fraud and one count of subscribing to a false tax return. Notably, this Court examined the sentence de novo because it fell under the PROTECT Act. Accordingly, review under the PROTECT Act is less deferential to a sentencing court than post-*Booker* reasonableness review under *Cooper* and its progeny. *Fred E. Cooper* weighs in favor of affirming Tomko's sentence because of the similar facts and the more stringent standard of review. At a minimum, although *Fred E. Cooper* involved a departure rather than a variance, it is instructive as to how this Court has viewed charitable activities for sentence mitigation. *See Jackson*, 467 F.3d at 839 (instructing that "[p]re-*Booker* law regarding Guidelines departures, therefore, necessarily informs the sentencing process–for district courts and for us") (citing *United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006), and *United States v. King*, 454 F.3d 187, 196 (3d Cir. 2006)).

With respect to Tomko's negligible criminal history, record of employment, and charitable work in the community, the majority separated out each of these factors and then concluded that none of them individually provided justification for a substantial downward variance. Perhaps anticipating a critique that an appellate court's role is to view these factors

cumulatively, the majority makes the conclusory statement that "[v]iewed cumulatively, the three factors considered by the District Court as mitigating factors–negligible criminal history, support and ties in the community and charitable work, employment record–pale in comparison to the numerous § 3553(a) factors suggesting that a term of imprisonment is warranted in cases of tax evasion as willful and brazen as Tomko's." Maj. Op. at 37. Missing from this statement is an adequate discussion of *why*, cumulatively, the District Court's extensive discussion of these factors is an abuse of discretion.

In sum, the majority exercises what amounts to de novo review and does not accord proper deference to the District Court's sentence, which was imposed after meaningful consideration and reasonable application of the § 3553(a) factors. Under our deferential reasonableness review, Tomko's sentence should be affirmed. *See also* 18 U.S.C. § 3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [§ 3553(a)(2)].").

Against the backdrop of the District Court's thorough discussion of the sentencing factors as they apply to Tomko, the majority stresses that the District Court did not specifically mention § 3553(a)(5), which states that a pertinent policy statement from the Sentencing Guidelines is a factor under § 3553(a). For crimes such as Tomko's, there are two pertinent policy statements. They emphasize the role of general

deterrence and reducing disparity in sentencing. *See* U.S. SENTENCING GUIDELINES MANUAL ch.2, pt.T, introductory cmt.; § 2T1.1, cmt. background. This latter policy statement mirrors § 3553(a)(6). The majority invokes this omission as the primary ground for overturning Tomko's sentence as unreasonable. *But see United States v. Dragon*, 471 F.3d 501, 505 (3d Cir. 2006) (stating that "judges need not routinely state that they have read the entire guidelines manual or all policy statements of the United States Sentencing Commission"). There are two main problems with the manner in which the majority relies on Sentencing Guideline policy statements. First, in doing so, the majority functionally exercises de novo review over Tomko's sentence. I have already discussed why, under reasonableness review rather than de novo review, Tomko's sentence should be affirmed.

Second, the majority overlooks that, even if we are to give significant weight to these policy statements, the District Court properly considered them in this case.

The "introductory commentary" quoted by the majority states, in part, that "[b]ecause of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines." U.S. SENTENCING GUIDELINES MANUAL ch.2, pt.T, introductory cmt. This focus on general deterrence is defined in the next sentence of the introductory comment, which states that "[r]ecognition

53

that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators." *Id.* The District Court in its lengthy discussion excerpted above explained why Tomko's sentence was commensurate with the gravity of his offense, but did so in light of the other § 3553(a) factors.[19] Nothing in this

---

[19] The majority unpersuasively relies on *United States v. Ture*, 450 F.3d 352 (8th Cir. 2006), as support for its viewpoint. Maj. Op. at 23-24. To begin, the Eighth Circuit in *Ture* did not appear to grant the sentencing judge the type of discretion given by our Court in our post-*Booker* jurisprudence. Indeed, the Eighth Circuit stated that "[a]n extraordinary variance from the Guidelines range must be 'supported by comparably extraordinary circumstances'." *Id.* at 357 (quoting *United States v. Claiborne*, 439 F.3d 479, 481 (8th Cir. 2006)). As the majority well knows, our Court has not adopted such a standard. Any serious reliance on *Ture* further counsels in favor of holding the present case c.a.v. pending the Supreme Court's disposition of *United States v. Gall*, No. 06-7949, which will examine the propriety of the lack of sentencing court deference in *Claiborne* and similar cases. There is also no indication that the sentencing court in *Ture* gave as comprehensive a discussion of the § 3553(a) factors as was given in the present case. Further, the sentencing court in *Ture* did not fine the defendant or even order restitution. *Id.* at 355. Tomko, though, was fined upward of eight times the Guidelines range. Similarly, the majority relies on the Second Circuit's decision in *United States v. Rattoballi*, 452 F.3d 127 (2d Cir. 2006), even though that Court has adopted a more stringent standard of reasonableness

54

introductory comment instructs courts to ignore § 3553(a)(1), (a)(2)(A), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(3), (a)(4), (a)(6), and (a)(7) because of the language in the comment.

The majority asserts that "[a]s a number of our sister circuits have recognized, 'unjustified reliance upon any one [§ 3553(a)] factor is a symptom of an unreasonable sentence.'" Maj. Op. at 36-37 (quoting *United States v. Rattoballi*, 452 F.3d 127, 137 (2d Cir. 2006); *accord United States v. Hampton*, 441 F.3d 284, 288-89 (4th Cir. 2006); *United States v. Givens*, 443 F.3d 642, 646 (8th Cir. 2006); *United States v. Cage*, 451 F.3d 585, 595-96 (10th Cir. 2006)). I agree. But the majority cannot justifiably rely on its interpretation of pertinent policy statements under § 3553(a)(5) to the exclusion of the other § 3553(a) factors. *Cf. United States v. Lloyd*, 469 F.3d 319, 324 (3d Cir. 2006) ("Under *Booker*, it is entirely appropriate for a court to consider pertinent policy statements."). The majority cites the applicable policy statement on criminal tax laws to state that general rather than specific deterrence is of paramount importance in these types of cases. *See* U.S. SENTENCING GUIDELINES MANUAL ch.2, pt.T, introductory cmt. Recognizing that there is not a mandatory requirement in the Guidelines to consider general deterrence in tax evasion cases, the majority instead cites to a decision by this Court that a sentence must be "minimally sufficient to satisfy concerns of retribution, general

---

than we have. *See, e.g.*, *United States v. Trupin*, 475 F.3d 71, 74 (2d Cir. 2007).

deterrence, specific deterrence, and rehabilitation." Maj. Op. at 23 n.9 (quoting *United States v. Serafini*, 233 F.3d 758, 776 (3d Cir. 2000) (quoting *United States v. Kikumura*, 918 F.2d 1084, 1111 (3d Cir. 1990)). *Serafini* dealt with perjury rather than tax evasion, and the quote from *Kikumura* refers to the goals of sentencing generally. *Serafini* and *Kikumura* certainly do not stand for the proposition that a sentencing court must grant paramount importance to the role of general deterrence in tax evasion cases.

In any case, the record before us makes clear that the District Court took all the pertinent factors into account in imposing its sentence, including general deterrence. At the sentencing proceeding, Assistant United States Attorney Conway made several statements indicating that the Government would not be satisfied with a sentence that did not include incarceration. A few examples will give the general tenor of the Government's position:

> 1. "He was willing to cheat his country, the very country that provided him with the opportunities to accumulate the wealth he did out of the money that it was rightfully entitled. At a time when our soldiers are risking their very lives for this country, Mr. Tomko can't even bring himself to pay his country what's rightfully owed."

2. "He was having his country and his fellow citizens subsidize his extravagant lifestyle, and the defense portrays him as some sort of great American. Well, I and my fellow citizens, who actually pay their fair share of their taxes, beg to differ."

3. "I know there are a lot of cynical people in our country that talk about – claiming that money can buy you out of trouble, but that's not how the system is supposed to work, not in this country. I hope you reflect how the system really works."

4. "A lengthy term of incarceration is also important for something you didn't mention in what you just went through, and that's third party deterrence, particularly in this industry. In this case, if this case is any indication, this contracting industry is riddled, riddled with tax fraud. A sentence of probation tells this industry: Go ahead, cheat on your taxes. If you get caught, you'll have to pay some money, but you won't have to go to prison."

5. "Real deterrence is jail."

6.      "Do the necessary and right thing in this case and send this tax cheat to jail."

Almost immediately *after* the Government made these statements, the District Court sentenced Tomko. The Government's statements regarding general deterrence, seen in statements three through six above, were delivered directly in front of the District Court. A sentencing court does not have to "discuss and make findings as to each of the § 3553(a) factors if the *record* makes clear the court took the factors into account in sentencing." *Cooper*, 437 F.3d at 329 (emphasis added) (citations omitted); *see also Rita*, 127 S. Ct. at 2469 (noting that "context and the record make clear that this, or similar, reasoning, underlies the judge's conclusion"). Here, "[t]he record makes clear that the sentencing judge listened to each argument." *Rita*, 127 S. Ct. at 2469.

Further, the District Court noted, soon after the Government made its statements about general deterrence, that it viewed Tomko's sentence as "address[ing] the sentencing goals of punishment, *deterrence* and rehabilitation." *See Rita*, 127 S. Ct. at 2468 ("In our view, given the straightforward, conceptually simple arguments before the judge, the judge's statement of reasons here, though brief, was legally sufficient."). It heard the Government's impassioned plea, considered general deterrence, and handed down Tomko's sentence.

58

I also note that the District Court's fine of $250,000 was over eight times above the upper end of the Guideline fine range. *See* U.S. SENTENCING GUIDELINES MANUAL § 5E1.2. The District Court stated that the Guideline fine range was insufficient deterrence because of Tomko's wealth. This large fine serves goals of both general and specific deterrence, punishing Tomko individually and also sending a signal to others in Tomko's financial position that a fine far above the Sentencing Guidelines suggestion may follow a guilty plea for tax evasion.[20] For these reasons, I believe the District Court took these policy statements into account.

---

[20] The District Court also stated that "I have sentenced him to the period of probation, which I recognize is below the guideline range. I also recognize that the fine is above the guideline range. Given the Defendant's wealth, the guideline range in fines is insufficient deterrence. Therefore, I've done this mitigation of the sentence under the provisions set forth in 18 U.S.C. § 3553 for the reasons I stated. *Taking all these factors into account*, the Court sentences the Defendant to a period of probation, a substantial fine, and allows for repayment to the Internal Revenue Service of his outstanding tax obligation." It is plain that the District Court realized that its sentence fell below the Guidelines range, and that the Court elected to impose this sentence even though the criminal tax laws emphasize general deterrence because of enforcement difficulties.

59

Similarly, the District Court properly considered and applied § 3553(a)(6). The Sentencing Guideline background comment quoted by the majority states, in relevant part, that "[t]his guideline is intended to reduce disparity in sentencing for tax offenses and to somewhat increase average sentence length. As a result, the number of purely probationary sentences will be reduced." U.S. SENTENCING GUIDELINES MANUAL § 2T1.1, cmt. background. The background comment's use of the word "reduce" rather than "eliminate" is telling. The District Court specifically addressed the need for consistent sentencing. The District Court stated: "I recognize the need for consistent sentencing; however, in this case, given the Defendant's lack of any significant criminal history, his involvement in exceptional charitable work and community activity, and his acceptance of responsibility, we find that a sentence that is mitigated by the factors of 3553 [is] warranted." This passage shows that the District Court explicitly considered § 3553(a)(6), which recognizes "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The background comment in § 2T1.1 mirrors § 3553(a)(6) in all relevant respects. In sum, even if we were to ignore our precedent and give undue weight to § 3553(a)(5), the District Court properly considered this factor. *See United States v. Charles*, 467 F.3d 828, 833 (3d Cir. 2006) (stating that the need for consistent sentencing "is just one factor (if relevant) that should be balanced against the others (again, if relevant)"); *United States v. Williams*, 458 F.3d 312, 320 (3d Cir. 2006)

60

("Although the Sentencing Guidelines were designed to limit judicial discretion in sentencing to ensure more uniform sentences, it did not eradicate all judicial discretion."). I also note that an over-reliance on § 3553(a)(6) necessarily encourages sentencing judges to automatically apply the Guidelines. Such a result renders the Guidelines mandatory and runs afoul of *Booker*.

We must keep in mind that a reviewing court must "apply a deferential standard" to the sentencing court's application of the factors to the circumstances of the case. *Cooper*, 437 F.3d at 330. The focus on review is not how the appellate court would have applied the § 3553(a) factors. Rather, the emphasis must be on "whether the district judge imposed the sentence he or she did for reasons that are logical and consistent with the factors set forth" in § 3553(a). *Id*. at 330 (quotation omitted). This deferential standard recognizes that "the trial court [is] in the best position to determine the appropriate sentence in light of the particular circumstances of the case." *Id*.; *see also Rita*, 127 S. Ct. at 2469 ("The sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than the Commission or the appeals court."). Simply weighing the § 3553(a) factors differently is no ground for vacating a sentence.

For the reasons stated above, I believe that the majority has applied the wrong standard of review to Tomko's sentence. The majority incorrectly draws a sharp line between reviewing

61

a district court's sentence procedurally and reviewing it substantively. As shown by the Supreme Court's recent decision in *Rita*, procedural and substantive review are interconnected in the reasonableness analysis. It is true that Justice Breyer's majority opinion stated in dicta that "[i]n sentencing, as in other areas, district judges at time make mistakes that are substantive. At times, they will impose sentences that are unreasonable. Circuit courts exist to correct such mistakes when they occur." *Rita*, 127 S. Ct. at 2466-67. The majority opinion in *Rita*, though, does not separate process from substance in the same manner as, for example, is done in the Second Circuit. *See, e.g.*, *United States v. Trupin*, 475 F.3d 71, 74 (2d Cir. 2007) ("Although the district court considered the section 3553(a) factors as required by *Booker*, it erred in its conclusion. This case thus turns on the result–the reasonableness of the sentence as a whole–*rather than the process that produced it*." (emphasis added)). The Supreme Court in *Rita* repeatedly stressed the importance of the process by which the sentencing court arrives at its conclusion. Similarly, our Court's jurisprudence, beginning with *Cooper*, stresses meaningful consideration of the § 3553(a) factors and then reasonable application of the factors to an individual defendant. *Cooper*, 437 F.3d at 329-30. As such, the substance of a sentence cannot be divorced from the process by which the district court handed down its sentence. Put differently, as in *Cooper*, an evaluation of the resulting sentence is necessarily and closely linked with the process that the sentencing court used to determine that sentence. At no point do we look at the

62

resulting sentence in isolation from the process that led to it. The majority has not cited any case from our Court for the propriety of making such a separation, for the simple fact that no such case exists.[21]

The extent to which the majority focuses on pure substance can be seen in its repeated references to the need for Tomko to spend time in jail in spite of the District Court's thorough examination of how and why the individualized § 3553(a) factors warranted a 12 month variance from the lower end of the Guidelines. The most logical inference from these

---

[21] I am not even sure that we can legitimately separate process from substance in the sentencing arena. Justice Stevens attempts to do this when, in providing an example of "purely procedural review," he states that "a district judge who gives harsh sentences to Yankees fans and lenient sentences to Red Sox fans would not be acting reasonably even if her procedural rulings were impeccable." *Rita*, 127 S. Ct. at 2473 (Stevens, J., concurring). This contention is effectively rebutted by Justice Scalia, who notes that "'[s]ubstance' and 'procedure' are admittedly chameleon-like terms." *Id*. at 2483 (Scalia, J., concurring in part and concurring in the judgment) (citation omitted). Like Justice Scalia, "my use of the term 'procedure' here includes the limiting of sentencing factors to permissible ones—as opposed to using permissible factors but reaching a result that is 'substantively' wrong." *Id*. It is for this reason that Justice Stevens' Yankees/Red Sox example is inapt. Substance and procedure are interrelated.

references is that it would have been impossible for the District Court in this case to justify the sentence given to Tomko, irrespective of the strength of reasons it provided. I cannot fathom how this conclusion is reconcilable with our post-*Booker* jurisprudence. *See Schweitzer*, 454 F.3d at 204 (noting that a sentence outside of the Guidelines range is not presumptively unreasonable). Such a conclusion, however, is necessary to the majority's conclusion precisely because the District Court gave such explicit consideration to § 3553(a) in imposing Tomko's sentence.

In order for the Guidelines regime to be truly advisory, a District Court must be able to *potentially*, when the proper situation arises, sentence a defendant outside the Guidelines range but within the statutory range. Any other conclusion would alter the statutory sentencing scheme as passed by Congress and interpreted by *Booker*. A secondary effect, of course, is to pressure district courts into either crafting sentences within the Guidelines range or, at a minimum, categorically ignoring substantial upward or downward variances. This situation seems to be contrary to *Rita*'s declaration that courts of appeals may adopt only a "*nonbinding* appellate presumption that a Guidelines sentence is reasonable." *Rita*, 127 S. Ct. at 2466 (emphasis added).

Focusing on substance rather than a combination of substance and process permits the majority to claim that its reasoning is not dependent on the "proportionality principle."

64

Regardless of whether the majority asserts that its reasoning does not depend on the proportionality principle, its overemphasis on Tomko's lack of imprisonment rather than the process used to arrive at the sentence of home confinement, 250 hours of community service, three years of probation, 28 days of in-house treatment for alcohol abuse, and a fine of $250,000, leads me to the conclusion that the majority has adopted some variant of the proportionality principle that will be taken up next term in *United States v. Gall*. Even if the question presented in *Gall* does not overlap entirely with the legal issues in this case, the *Gall* decision will more than likely influence or possibly control the outcome of this case. This case should be held c.a.v. pending the outcome of *Gall*.

### III.

The precedential effect of the majority's opinion will be to deter District Courts from sentencing a defendant to a within-statutory but outside-Guidelines range. This "gravitational pull" toward a within-Guidelines sentence, *Rita*, 127 S. Ct. at 2487 (Souter, J., dissenting), is much greater in this case than, for example, a "nonbinding appellate presumption" of reasonableness for a within-Guidelines sentence. *See id*. at 2466. If I were a sentencing judge, I would not know which types of cases fall into the majority's spectrum of cases that are ineligible for substantial variances regardless of the reasons given by that judge.

A sentencing court has an obligation to tell us how it arrived at the sentence, as the purpose of our meaningful consideration/reasonable application requirement is for the District Court to "state adequate reasons for a sentence on the record so that this court can engage in meaningful appellate review." *United States v. King*, 454 F.3d 187, 196-97 (3d Cir. 2006). "By articulating reasons, even if brief, the sentencing judge not only assures reviewing courts (and the public) that the sentencing process is a reasoned process but also helps that process evolve." *Rita*, 127 S. Ct. at 2469. I do not see how the District Court's extensive discussion of the relevant facts and law prevents us from engaging in meaningful appellate review. In engaging in this review, I also fail to see how the District Court in this case abused its discretion, in light of its justification for Tomko's variance. The majority's holding simply cannot be squared with our decision in *United States v. Cooper*, 437 F.3d 324 (3d Cir. 2006) and its progeny, the text of 18 U.S.C. § 3553(a), or *Rita v. United States*, --- U.S. ---, 127 S. Ct. 2456 (2007). For these reasons, I respectfully dissent.